**BOIES SCHILLER FLEXNER LLP**
Duane L. Loft, NY State Bar No. 4397733*
*dloft@bsfllp.com*
Brianna S. Hills, NY State Bar No. 5652599*
*bhills@bsfllp.com*
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2380

John Kucera, State Bar No. 274184
*jkucera@bsfllp.com*
725 S Figueroa Street, 31st Floor
Los Angeles, CA 90017
Telephone: (213) 995-5758
Facsimile: (213) 629-9022

*Attorneys for Petitioners*
(Additional counsel listed on the following page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Application of<br><br>FOURWORLD EVENT OPPORTUNITIES, LP and GENESIS EMERGING MARKETS INVESTMENT COMPANY,<br><br>Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery For Use In a Foreign Proceeding. | Case No. 22- mc-00022<br><br>**APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** |

1    Additional counsel for Petitioners:

2
     **GRANT & EISENHOFFER P.A.**
3    Christine Mackintosh, DE State Bar No. 5085*
     *cmackintosh@gelaw.com*
4    123 S. Justison Street
5    Wilmington, DE 19801
     Telephone: (302) 622-7081
6    Facsimile: (302) 622-7100

7
     **LABATON SUCHAROW LLP**
8    Ira A. Schochet, NY State Bar No. 1858265*
     *ischochet@labaton.com*
9    140 Broadway
     New York, NY 10005
10   Telephone: (212) 907-0864
     Facsimile: (212) 818-0477
11

12
13   **pro hac vice* application forthcoming

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

1

# **TABLE OF CONTENTS**

2

3   PRELIMINARY STATEMENT ...................................................................7

4   FACTUAL BACKGROUND.....................................................................10

5       A.   Parties to the Foreign Proceeding...........................................10

6       B.   The Merger ..............................................................................10

7       C.   The Merger's Unfair Price and Process...................................14

8       D.   Petitioners' Cayman Islands Appraisal Proceeding ...............16

9       E.   Discovery in the Cayman Islands Appraisal Proceeding .......17

10      F.   Respondent and the Discovery Sought.....................................18

11  ARGUMENT .........................................................................................19

12      I.   The Application Satisfies the Section 1782's Statutory
13          Requirements. ..........................................................................20

14          A.   Respondent Is Found in this District. ........................20

15          B.   The Discovery Sought Is "For Use" In a Foreign
               Proceeding. ..................................................................22

16          C.   Petitioners Are "Interested Persons." ........................24

17      II.  The *Intel* Discretionary Factors Weigh in Favor of Granting
18          Discovery..................................................................................24

19          A.   Respondent Is Non-Participant in the Appraisal
               Proceeding. ..................................................................24

20          B.   The Cayman Court Will Be Receptive to the
21                 Evidence Sought. .........................................................25

22          C.   Petitioners Are Not Circumventing Foreign Proof-
               Gathering Restrictions. ................................................28

23          D.   The Subpoena Is Not Unduly Burdensome. ...............29

24          E.   Expedited Compliance with the Subpoenas Is
25                 Warranted.....................................................................30

    CONCLUSION.......................................................................................30

26

27

28

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011) ..................................................... 27

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ..................................................................... 28

*de Leon v. Clorox Company*,
    No. 19-mc-80296-DMR, 2020 WL 4584204 (N.D. Cal. Aug. 10, 2010) ............. 28

*Euromepa, S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) .......................................................... 25, 30

*First Am. Corp. v. Price Waterhouse LLP*,
    154 F.3d 16 (2d Cir. 1998) ..................................................................... 29

*FourWorld Event Opportunities, LP v. Houlihan Lokey, Inc.*,
    No. 21-mc-01019, ECF No. 56 (C.D. Cal. Jan. 6, 2022) ....................... 26

*Gushlak v. Gushlak*,
    486 Fed. App'x 215 (2d Cir. 2012) ............................................... 27, 29

*Illumina Cambridge Ltd. v. Complete Genomics, Inc.*,
    No. 19-mc-80215-WHO(TSH), WL 820327 (N.D. Cal. Feb. 19, 2020) ...... 9, 22, 28

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017) .......................................................... 22, 23

*In re Appl. of Joint Stock Co. Raiffeinsenbank*,
    No. 16-mc-80203-MEJ, 2016 WL 6474224 (N.D. Cal. Nov. 2, 2016) ............... 30

*In re Application of Athos Asia Event Driven Master Fund*,
    No. 1:21-MC-00208-GBF, ECF 8 (S.D.N.Y. Mar. 3, 2021) ................... 27

*In re Application of Athos Asia Event Driver Master Fund*,
    No. 4:21-MC-00153-AGF, 2021 WL 1611673 (E.D. Mo. Apr. 26, 2021) .......... 27

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998) ...................................................... 8, 29

*In re Del Valle Ruiz*,
 939 F.3d 520 (2d Cir. 2019) ..................................................................... 22

*In re Ex Parte Appl. of Ambercroft Trading Ltd.*,
 No. 18-mc-80074-KAW, 2018 WL 2867744 (N.D. Cal. June 11, 2018)..27, 28, 30

*In re Ex Parte Appl. Varian Med. Sys. Int'l AG*,
 No. 16-mc-80048-MEJ, 2016 WL 1161568 (N.D. Cal. March 24, 2016) .25, 27, 29

*In re Koninklijke Philips N.V.*,
 No.: 17-MC-1681-WVG, 2018 WL 620414 (S.D. Cal. Jan. 30, 2018).................. 28

*In re Metallgesellschaft AG*,
 121 F.3d 77 (2d Cir. 1997) ........................................................................ 28

*In re Mut. Assistance of Local Court of Wetzlar, Germany*,
 No. 1:17–mc–00078–SKO, 2018 WL 2183966 (E.D. Cal. May 11, 2018) .... 19, 30

*In re Penner*,
 No. 17-cv-12136-IT, 2017 WL 5632658 (D. Mass. Nov. 22, 2017) ..................... 27

*In re Petrobras Securities Litig.*,
 393 F. Supp. 3d 376 (S.D.N.Y. 2019)........................................................ 20

*In re Platinum Partners Value Arbitrage Fund L.P.*,
 583 B.R. 803 (Bankr. S.D.N.Y. 2018) .................................................... 27

*In re Republic of Ecuador*,
 No. C–10–80225 MISC CRB (EMC), 2010 WL 3702427 (N.D. Cal. Sept. 15, 2010)........................................................................................ 19, 25, 30

*In re Request for Judicial Assistance from the Seoul Dist. Criminal Court*,
 555 F.2d 720 (9th Cir. 1977) .................................................................. 23

*In re Wireless Facilities, Inc. Derivatives Litig.*,
 562 F. Supp. 2d 1098 (S.D. Cal. 2008) .................................................. 21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
 542 U.S. 241 (2004) ......................................................................passim

*IPCom GMBH & Co. KG v. Apple Inc.*,
 61 F. Supp. 3d 919 (N.D. Cal. 2014) ..................................................... 27

*Lew v. Moss*,
 797 F.2d 747 (9th Cir. 1986).............................................................20, 21

5

*LP Digital Solutions v. Signifi Solution, Inc.*,
   921 F. Supp. 2d 997 (C.D. Cal. 2013).................................................................20

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015)..............................................................................23

*Minatec Finance S.A.R.L. v. SI Grp. Inc.*,
   Civ. No. 1:08–CV–269 (LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008)
   ...........................................................................................................................30

*Siemens AG v. W. Digital Corp.*,
   No. 8:13–cv–01407–CAS–(AJWx), 2013 WL 5947973 (C.D. Cal. Nov. 4, 2013)
   ....................................................................................................................25, 28

**Statutes**

28 U.S.C. § 1782....................................................................................*passim*

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Through this Application under 28 U.S.C. § 1782 (the "**Application**"), FourWorld Event Opportunities, LP and Genesis Emerging Markets Investment Company ("**Petitioners**") respectfully seek an order: (a) granting Petitioners leave to serve a subpoena (the "**Subpoena**") on Christopher Hsu (**"Hsu"** or "**Respondent**"); (b) directing Respondent to produce the materials described in the Subpoena within thirty days of service of the Subpoena; (c) directing Respondent to appear for a Rule deposition in compliance with the Subpoena on a mutually agreeable date within a reasonable time after Respondent's confirmation of the final production of documents in response to the Subpoena; and (d) granting any and all other relief the Court deems just and proper.

Pursuant to Local Rule 7-2(b)(1), Petitioners state that they cannot presently schedule a date and time for a hearing on this Application, should a hearing be necessary, as the matter has not yet been assigned.

## **PRELIMINARY STATEMENT**

Petitioners respectfully submit this Application pursuant to 28 U.S.C. § 1782 to take limited discovery from an individual found in this District for use in connection with an appraisal proceeding filed in the Grand Court of the Cayman Islands (the "**Cayman Court**") on November 10, 2020 (the "**Appraisal Proceeding**"). In the Appraisal Proceeding, Petitioners (and other dissenting shareholders) seek a determination of the fair value of their former shareholdings in 58.com ("**58.com**" or the "**Company**"), a Cayman Islands company that was delisted from public exchanges, including the New York Stock Exchange, and taken private in September 2020. Petitioners' shares were forcibly canceled through a merger orchestrated by the company's CEO and several private-equity funds (the "**Merger**").

The Merger was coercive and fundamentally unfair to minority shareholders, both with respect to the Merger price, which significantly undervalued 58.com's shares, and the process to approve the Merger. The Merger capitalized on a temporary decline in 58.com's trading prices during the COVID-19 pandemic. No effort was

undertaken to shop the Company to competing bidders to ensure that 58.com shareholders received fair value for their shares. And the Merger was orchestrated by majority shareholders—including the Company's founder and CEO—without the consent of a substantial amount of minority shareholders, who were offered inadequate consideration for their shares. The Buyer Group (defined below) that took the Company private collectively held 44% of the Company's voting shares, and other principal shareholders (who collectively held 28% of the Company's voting power) were incentivized to vote for the Merger because they were not required to exchange their shares for the inadequate Merger consideration (*i.e.*, their shares were rolled over into the merged company and they received an increased proportionate equity interest). Thus, the Buyer Group was effectively able to force the Merger upon minority shareholders without their consent.

Through this Application, Petitioners seek narrowly tailored discovery from Respondent, a representative of Kaihui Limited (**"Kaihui Limited"**), an entity that served as a strategic advisor to the board of 58.com in relation to the Merger. Respondent was closely involved in the process of negotiating the Merger Price, including substantial interactions with the Special Committee during its evaluation of the fairness of the Merger Price. The evidence sought through this Application from Respondent will therefore be relevant to the core issue in the Appraisal Proceeding, in which the Cayman Court will determine the fair value of the Petitioners' shares.

Section 1782 authorizes this Court to order discovery from any person or entity that resides or is found in this district to assist with pending or contemplated proceedings before foreign tribunals. Section 1782's broad applicability and "modest prima facie elements" reflect "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

As described below, Petitioners' Application meets all of the statutory requirements of Section 1782: (i) Respondent "resides" or is "found" in the Central District of California; (ii) the requested discovery is "for use" in a foreign proceeding,

namely the Appraisal Proceeding; and (iii) Petitioners, as claimants in the Appraisal Proceeding, easily meet the standard for an "interested person" under the statute. In addition, each of the Supreme Court's factors that guide this Court's exercise of discretion under Section 1782 weigh decisively in favor of granting Petitioners' Application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004).

*First*, Petitioners seek discovery from a "nonparticipant" in the foreign action. *Id.* Respondent is not a party in the Appraisal Proceeding or otherwise subject to the jurisdiction of the Cayman Court.

*Second*, there is no indication, let alone the required "authoritative proof," that the Cayman Court might be unreceptive to Section 1782 assistance. *Id.* To the contrary, as established in the accompanying expert declaration of Justice Ingrid Mangatal (Ret'd), Petitioners will have the right to present evidence gathered under Section 1782 to the Cayman Court in support of its claims.

*Third,* the Application is not concealing any improper attempt to circumvent any foreign discovery restrictions on proof gathering. *Intel*, 542 U.S. at 265. The requested discovery does not implicate any privilege or special protection that would make it improper under the law of the Cayman Islands.

*Fourth*, the proposed discovery is not unduly burdensome. *Id.* To the contrary, the Subpoena is narrowly tailored to seek information directly relevant to the critical issues in the Appraisal Proceeding—namely evidence addressing the fair value of the Petitioners' shares and the process that 58.com undertook to effect the Merger.

*Finally*, there can be no serious dispute that Respondent has possession, custody, or control of the requested discovery. Nor should the location of the requested evidence alter the Court's discretion. *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-WHO(TSH), 2020 WL 820327, at *10 (N.D. Cal. Feb. 19, 2020) ("concerns about producing documents located outside the United States is

largely anachronistic, as . . . documents and information are often located in electronic
storage, which can be accessed with equal effort from any location").

## **FACTUAL BACKGROUND**

### **A.    Parties to the Foreign Proceeding**

Petitioners are funds that invested in 58.com and owned 58.com shares immediately before the effective date of the Merger that is the subject of the Appraisal Proceeding. *See* Declaration of Marc Kish in Support of Petitioners' Application ("**Kish Decl.**") ¶ 4. Petitioners are respondents in the Appraisal Proceeding. *Id.* ¶ 2.

Before the Merger, 58.com was a publicly traded corporation incorporated in the Cayman Islands. *Id.* ¶ 14. The Company's American Depository Shares (**"ADS"**) first began trading on the New York Stock Exchange in 2013 and were listed under the symbol "WUBA." *Id.* ¶ 15. The Company operates China's largest online classifieds business, as measured by traffic and revenue.

Jinbo Yao, the Company's CEO and founder, historically maintained significant control over the voting shares of 58.com. According to the Proxy Statement filed on August 7, 2020 (the "**August 2020 Proxy Statement**"), as of that day, Mr. Yao—through entities affiliated with and controlled by him—controlled 44.02% of the total voting power of the Company's outstanding shares. *Id.* ¶ 16.

### **B.    The Merger**

On June 15, 2020—three months after the world was plunged into the COVID-19 global pandemic, which had a temporary negative impact on the demand for the Company's online classifieds services and thus its share price—the Company announced that it had entered into a merger agreement through which 58.com would be acquired by Mr. Yao along with a consortium of private equity funds (the **"Buyer Group"**). *Id*., Ex. A ¶ 5. In addition to Mr. Yao, the Buyer Group also included funds wholly owned by Warburg Pincus LLC and General Atlantic LLC—two New York-based private equity firms—along with Ocean Link Partners L.P., a China-based private equity firm. As noted, through Mr. Yao, the Buyer Group collectively

controlled over 44% of the Company's voting shares as of August 7, 2020. Kish Decl. ¶ 20.

The announcement stated that on the effective date of the Merger, 58.com's publicly traded ADS—equity shares of a foreign company held by a U.S. depositary bank available for purchase by U.S. investors—would be canceled in exchange for the right to receive $56 per ADS.[1]  *Id.* ¶ 21.  Under the terms of the Merger, 58.com was to become a wholly-owned subsidiary of a company called Quantum Bloom Group Ltd., which would be beneficially owned by the Buyer Group, including Mr. Yao, Warburg Pincus, General Atlantic, Ocean Link, and others.  *Id*.

Notably, other principal shareholders of the Company, including Tencent Holdings Ltd. (the **"Rollover Shareholders"**), controlled over 28.26% of the voting shares of 58.com.  *Id.* ¶ 23.  It was explicitly agreed under the terms of the Merger that shares held by the Rollover Shareholders would not be canceled in exchange for the Merger price.  *Id.*  Rather, shares held by the Rollover Shareholders would be converted into shares of the new private 58.com entity (and their pro-rata equity interest increased from 22.44% to 33.25%, thus giving the Rollover Shareholders a significant financial benefit).  *Id.*

The lead-up to the Merger announcement was characterized by a flawed process designed to engineer the management buyout desired by Mr. Yao and his private equity partners. On March 24, 2020, the Company engaged Kaihui Limited, of which Respondent is a representative, as its consultant to explore strategic transactions.  On April 2, 2020, Kaihui Limited contacted Ocean Link; incredibly, that very evening, Ocean Link submitted a proposal to acquire all the outstanding shares of the Company

---

[1] 58.com's publicly traded ADS were traded on the New York Stock Exchange. 58.com also had two other classes of shares—Class A shares and Class B Shares—which were privately held.  Loft Decl., Ex. 3 at 1, 16.  Under the terms of the Merger, Class A and Class B shares were canceled in exchange for the right to receive $28 per share. *Id*. at 4.

at $55 per ADS. *Id.* ¶ 24. The Company then decided to create a Special Committee of independent members of the board of directors, which would be tasked with considering the Merger. However, there were no independent board members at the time. The Company consequently appointed two new members to the board: Li (Lily) Dong (**"Ms. Dong"**) and Robert Frank Dodds, Jr. (**"Mr. Dodds"**) who, together, comprised the entire Special Committee.[2] *Id.* ¶ 24.

On April 27, 2020, the Special Committee approved the engagement of Houlihan Lokey (**"Houlihan"**) as its financial advisor. *Id.* ¶ 25. On May 8, 2020, at the request of the Special Committee, the Company began preparing financial projections "for use by [Houlihan] in connection with its financial analysis."[3] These projections, prepared for the purpose of Houlihan's valuation, were created under the watch of the Company management who had an obvious incentive to underestimate the Company's financial prospects. Indeed, Houlihan's valuation presentation shows the Company management's profit projection was uniformly lower than the projections of all nine Wall Street analysts who followed the Company closely.[4]

On May 21, 2020, the Special Committee, while purportedly comprised of independent directors, nonetheless declined to either conduct a "market check"—that is, declined to contact other entities that might have wished to bid for control of 58.com—or to insist on negotiations with the Buyer Group for the right to conduct a "go-shop," a procedure by which 58.com would be permitted to solicit competing bids. *Id.* ¶ 25. The result was that the Buyer Group's bid was never tested in the market,

---

[2] Ms. Dong and Mr. Dodds were appointed after the resignation of Hurst Frank Lin, an independent director who had served on the Company's board for over ten years. Despite deeming Ms. Dong and Mr. Dodds to be independent directors, the Company never disclosed Ms. Dong's and Mr. Dodd's preexisting relationships to the Company management or their relationships to the members of the Buyer Group.
[3] August Proxy Statement at 29.
[4] June 12, 2020 Houlihan Limited Presentation, Loft Decl., Ex. 7 at 23.

and shareholders lost all benefits of a competitive process to determine their shares' actual market value.

Other features of the Merger process give rise to significant concern. The Special Committee treated Kaihui Limited as its advisor and agent throughout its negotiations with the Buyer Group, even though Kaihui Limited was hired by the same members of the Company's management that would later propose the transaction as part of the Buyer Group. For example, on June 5, 2020, the Special Committee discussed with Kaihui Limited "the position to be taken and approach to be followed in negotiating the price with the Buyer Group."[5]  On June 10, 2020, the Special Committee again discussed "the proposed purchase price" and "other key issues" with Kaihui Limited, after which Kaihui Limited held discussions with the Buyer Group.[6] Declaration of Duane L. Loft in Support of Application ("**Loft Decl.**"), Ex. 3 at 33. Kaihui Limited effectively represented both the Special Committee and the Buyer Group, creating a conflict of interest. Ultimately, the Special Committee and the Buyer Group agreed to a purchase price of $56 per ADS, but only after removing a critical protection that would have required approval by a majority of the minority shareholders (the **"MoM Condition"**) to protect minority shareholder rights, making the approval of the transaction almost certain regardless of support from the minority shareholders. Kish Decl. ¶ 26. All in all, from the first Ocean Link proposal on April 2 to the final agreement on purchase price on June 15, the negotiation process took only 74 days, and the price negotiation only lasted 10 days, a staggeringly rushed timeline designed to undervalue the Company and squeeze out minority shareholders.

---

[5] *Id.* at 31.
[6] *Id.* at 33.

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

*Id.*   The Merger announcement led to immediate concern expressed by minority shareholders and independent industry commentators.[7]

On September 7, 2020, the Company held an extraordinary general meeting of shareholders ("**EGM**"), at which time 58.com shareholders voted on whether to approve the Merger.   Kish Decl. ¶ 27.   Only 15% of all shareholders that were unaffiliated with either the Buyer Group or Rollover Shareholders voted in favor of the transaction.   Despite such widespread opposition from the unaffiliated shareholders,[8] the transaction was forced through, given the lack of MoM: 61% of the Class A and Class B shareholders attended the EGM (which represented approximately 65% of the total outstanding votes), and the Merger was approved by over 75% of the total votes that were cast, with Rollover Shareholders themselves surprisingly opting to abstain.  *Id.*

Accordingly, Petitioners' shares and the shares of all remaining 58.com stockholders—other than Members of the Buyer Group—were canceled in exchange for the Merger consideration effective September 17, 2020, at a price that Petitioners allege is substantially below their fair value.  *Id.* ¶ 28.

**C.   The Merger's Unfair Price and Process**

As alleged in the Appraisal Proceeding, the Merger price significantly undervalued 58.com shares and was coercive and unfair to minority shareholders. *First*, the Merger was timed to capitalize on a temporary depression in 58.com's

---

[7] In June 2020, minority shareholder Aberdeen Standard Investments Ltd. wrote a letter to the SEC urging the agency to bar interested parties from voting on the proposal.  *See* Loft. Decl. Ex. 5. On August 26, 2020, Institutional Shareholder Services ("ISS"), a well-respected proxy-advisory firm, that advises institutional investors on shareholder voting and corporate governance matters, published a report opposing the transaction, stating "[t]he process that led to the buyer group's offer was flawed and the result of that process is questionable."  ISS also performed its own financial analysis that showed "[t]he value offered to shareholders is out of sync with the company's historical valuation relative to peers." *See* Loft. Decl. Ex. 6.

[8] Notices of objection were delivered by shareholders of at least 70,524,198 shares.

trading prices associated with the pandemic.  The proposed buyout price of $56 per ADS is dramatically below 58.com's pre-pandemic trading prices.  Indeed, on January 16, 2020—immediately before the market-wide decline associated with coronavirus— 58.com's NYSE-listed ADS closed in excess of $69 per share.  *Id.* ¶ 33.

*Second*, as noted, the Merger did not contain a MoM Condition to protect 58.com's minority shareholders.  Incredibly, the Special Committee agreed to waive this critical protection in exchange for a mere $1 increase in the proposed purchase price and the removal of an option to not progress with the Merger based on the number of shareholders exercising dissent rights.  Without MoM protection, the deal was a foregone conclusion because the Buyer Group collectively controlled the majority of the Company's voting shares.

*Third*, the process to approve the Merger was flawed.  The Special Committee made no effort to conduct a proper competitive sale process and thus allowed the Buyer Group and Rollover Shareholders to cash out the Dissenting Shareholders at a depressed price.  Faced with a Buyer Group that controlled such a large number of the Company's shares and that was led by the CEO, the Special Committee did not solicit a single additional bid, did not conduct a "market check," and did not insist on a "go-shop" provision—all standard features of a legitimate sale process intended to protect minority shareholders.  *Id.* ¶ 25.  The Special Committee was also responsible for negotiating away the critical MoM protection mentioned above.  *Id.* ¶ 26.

*Fourth*, the Merger was structured such that all shares *other than* those held by the Buyer Group and the Rollover Shareholders were to be cashed out through the Merger.  Neither would be losing their stake in the Company and its valuable business in return for receiving only the $56 Merger consideration.  Furthermore, even though the Rollover Shareholders were not buying any shares, or otherwise funding the Merger, once the Merger was completed, the Rollover Shareholders proportionate equity interest increased from 22.44% to 33.25 %.  Thus, the Rollover Shareholders had every reason to allow the Merger to proceed, at the expense of minority

shareholders.  And the Buyer Group, with the help of the Rollover Shareholders, could push the Merger through with over 75% of the voting shares cast.  *Id.* ¶ 27.

*Fifth*, the fact that Mr. Yao—58.com's longtime controlling shareholder, founder, Chairman, and CEO—helped orchestrate the Merger at a depressed price indicates the Merger was essentially a management buyout of 58.com and shows the Company was taken private to enrich those in control of the Company at the expense of minority shareholders.  Despite Mr. Yao's fiduciary obligation to steward 58.com for the benefit of all shareholders, he teamed up with private equity funds to buy the Company for his own benefit while its trading price was depressed.

*Finally*, under the terms of the Merger Agreement, in the event the Company received an unsolicited alternative bid of greater value (a **"Superior Proposal"**), the Buyer Group had unlimited match rights.[9]  To be able to accept a Superior Proposal, the Company and the board had to, among other things, provide the Buyer Group with an opportunity to match or exceed the competing bid and pay a termination fee of $126,400,000.[10]  Under those circumstances, any bidder understood that the Buyer Group—which included senior 58.com management with exclusive inside knowledge of the Company—would likely match each bid up to the fair value of the Company, causing such a bidder to risk overpaying for the 58.com shares.  These onerous requirements essentially guaranteed the Merger would be unchallenged by any competing bid, and deterred potential bidders from making a bid in the first place.

### D.    Petitioners' Cayman Islands Appraisal Proceeding

Under Section 238 of the Companies Act, the Cayman Court in the Appraisal Proceeding has a statutory obligation to determine the fair value of the dissenting shareholders' former shareholdings in the Company. As described in the accompanying declaration of Judge Mangatal ("**Mangatal Decl.**"), the parties to the

---

[9] *See id.* at 107.
[10] *See id.* at 108, 115.

Appraisal Proceeding—including the Petitioners and 58.com—will submit evidence, expert testimony, and legal briefs to the Cayman Court, which will weigh the evidence and determine the fair value of Petitioners' shares. *See* Mangatal Decl. ¶ 30. In assessing fair value in a Cayman Islands Appraisal Proceeding, the Cayman Court will examine the fairness (or lack thereof) of the process that led 58.com's board to approve the Merger. In doing so, the Cayman Court will consider, among other things, (i) the process by which the 58.com board and/or Special Committee negotiated and approved the Merger price, and (ii) the valuations relied upon by the 58.com Special Committee and the Buyer Group.

### E.    Discovery in the Cayman Islands Appraisal Proceeding

There is no automatic right to discovery in Section 238 proceedings similar to pre-trial discovery in the United States. Only upon Court order is a party to the proceeding required to provide discovery of "documents which are in their possession, custody or power relating to any matter in question between them in the action." Mangatal Decl. ¶ 31 (citing Grand Court Rules ("GCR") Order 24 rule 3). Discovery of non-parties like Respondent outside the Court's jurisdiction is very limited, subject to cumbersome procedures, and rarely used. Mangatal Decl. ¶¶ 31–32. Nevertheless, Cayman Islands courts remain receptive to evidence obtained through judicial measures such as 28 U.S.C. § 1782. Indeed, as explained by Judge Mangatal, "Cayman courts . . . have held that it is permissible for a litigant in a Cayman Islands proceeding to exercise any rights it may have under 28 U.S.C. § 1782 to obtain relevant evidence, including deposition testimony, for use in proceedings in the Cayman Islands." *Id.* ¶ 54. All relevant evidence obtained through this Application will thus be admissible in the Cayman Court.

Furthermore, Cayman Courts expect parties to obtain the evidence they believe necessary to prosecute their case. *Id.* ¶ 66. There is no requirement to get permission from a Cayman Court before seeking relevant evidence in the U.S. under 28 U.S.C. § 1782. *Id.*

### F.    Respondent and the Discovery Sought

Respondent is Christopher Hsu, a representative of Kaihui Limited, which served as a "strategic consultant" to the Company "to explore potential strategic transactions." *See* Kish Decl. ¶ 24.  A licensed private investigator's search of various databases stated the following: (1) Respondent has an "active address" at, is a "current resident" of, home in Upland, California; (2) individuals that appear to be Respondent's parents reside in Upland, California; (3) Respondent has a current mobile phone number with a San Bernardino county area code; (4) Respondent is registered to vote in California; (5) in February 2020, Respondent was sentenced for various criminal charges in Orange County Superior Court; (6) Respondent is currently serving a probation resulting from a criminal conviction in Orange County Superior Court, which is set to expire in 2023; and (7) until 2020, Respondent owned properties in California.  Burtis Decl. ¶¶ 3–4.

Petitioners seek limited discovery from Respondent targeted at issues central to the Appraisal Proceeding.  Respondent served as a strategic consultant to the Company during the Merger negotiation period, advising on "potential strategic transactions, including possible minority or control transactions, mergers and acquisitions, debt financings or equity financings." SEC filings describe how Respondent (1) participated in numerous major meetings and calls during which the board, the Special Committee, Houlihan, the Buyer Group, and the Rollover Shareholders discussed the Merger and (2) provided key services to the board during the process to negotiate and complete the Merger. *See* Loft Decl., Ex. 3.

Petitioners' Application seeks discovery from Respondent concerning: (i) documents pertaining to the fairness of the Merger price and the process used to reach it, and (ii) documents related to Respondent's role and responsibilities as the strategic consultant to 58.com and its Board, including the advice and analysis Respondent was tasked with providing concerning the Merger ("**Requested Discovery**").  The Requested Discovery will significantly assist the Cayman Court in its evaluation of

the Merger and determination of the fair value of Petitioners' shares in 58.com. *See*
Mangatal Decl. ¶¶ 68–69.

## **ARGUMENT**

Section 1782 of Title 28 of the United States Code permits United States district
courts to grant discovery for use in a pending foreign proceeding or a foreign
proceeding. *Intel*, 542 U.S. at 249. The statute states in relevant part:

> The district court of the district in which a person resides or
> is found may order him to give his testimony or statement or
> to produce a document or other thing for use in a proceeding
> in a foreign or international tribunal . . . . The order may be
> made . . . upon the application of any interested person.

28 U.S.C. § 1782. An application under Section 1782 must satisfy three statutory
requirements: (1) the discovery is sought from someone who resides or is found within
the District; (2) the discovery is for use before a foreign tribunal; and (3) the applicant
is an "interested person." *In re Republic of Ecuador*, No. C–10–80225 MISC CRB
(EMC), 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010).

If the statutory requirements are met, the court then considers four discretionary
"*Intel*" factors: (1) whether the person from whom discovery is sought is a
"nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal,
the character of the proceedings underway abroad, and the receptivity of the foreign
government or the court or agency abroad to U.S. federal-court judicial assistance;"
(3) whether the request "conceals an attempt to circumvent foreign proof-gathering
restrictions or other policies of a foreign country or the United States;" and (4) whether
the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65.[11]

---

[11] No one factor should be given more weight than the others, and no one factor is
dispositive. *See In re Mut. Assistance of Local Court of Wetzlar, Germany*, No. 1:17–
mc–00078–SKO, 2018 WL 2183966, at *3 (E.D. Cal. May 11, 2018). The *Intel* factors
"involve overlapping considerations, are considered collectively by the court in
exercising its discretion, and are not stand-alone categorical imperatives." *In Matter*

**I.**     <u>**The Application Satisfies the Section 1782's Statutory Requirements**</u>.

       **A.**     **Respondent Is Found in this District.**

       According to a licensed private investigator's database search, Respondent is a "current resident" of a home in this District. Burtis Decl. ¶ 3. Residence in this District satisfies Section 1782's statutory requirement that a respondent "resides or is found" in this District.

       There does not appear to be binding precedent in this District on whether the "resides or is found" language in Section 1782 means the court must have personal jurisdiction over the party from whom Petitioners seek discovery. However, courts in other jurisdictions have found that Section 1782's statutory prerequisite is coextensive with personal jurisdiction. *See In re Petrobras Securities Litig.*, 393 F. Supp. 3d 376, 381 (S.D.N.Y. 2019) ("district courts should read the "resides or is found" language in § 1782 to incorporate a personal jurisdiction requirement.").

       This Court has general personal jurisdiction over Respondent. General jurisdiction can be established by an individual's domicile or, in the alternative, his or her "continuous and systematic" contacts with the forum. *See LP Digital Solutions v. Signifi Solution, Inc.*, 921 F. Supp. 2d 997, 1003 (C.D. Cal. 2013). Respondent satisfies both standards. *First,* Respondent is domiciled in this District. "[A] person is 'domiciled' in a location where he or she has established a 'fixed habitation or abode in a particular place,' and [intends] to remain there permanently or indefinitely." *Lew v. Moss*, 797 F.2d 747, 749–50 (9th Cir. 1986). Relevant to establishing domicile are the following "number of factors [with] no single factor controlling":

---

*of Appl. of Action & Prot. Found.*, No. C 14–80076 MISC EMC (LB), 2014 WL 2795832, at *4 (N.D. Cal. June 19, 2014). In its analysis, the court must consider "the twin aims" of "providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *In re Pioneer Corp. v. Technicolor, Inc.*, No. LA CV18-04524 JAK, 2018 WL 4961911, at *4 (C.D. Cal. Sept. 12, 2018).

> [C]urrent residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes.

*Id.* at 750.  Aside from being listed as a "current resident" of this District, Respondent is registered to vote in the state of California, has a San Berardino county phone number, and has family in this District.  Burtis Decl. ¶ 3.  Respondent until recently owned real property in this District: he was identified as the owner of a vacant lot in Oak Hills, CA until 2020, and he was the owner of a condominium in Newport Beach until 2014.  *Id.*  Further, Respondent was charged in the Superior Court of California, Orange County, on June 16, 2018 with robbery in the first degree, among other charges.  *Id.* ¶ 4.   Respondent was sentenced in February 2020 and is serving a three-year probation term set to end on February 5, 2023, which the court recently declined to modify.  *Id.*   The weight of these facts irrefutably indicates that Respondent is domiciled in this District.  *See Lew*, 797 F.2d at 750 ("domicile is evaluated in terms of objective facts" and "statements of intent are entitled to little weight when in conflict with facts") (citation omitted); *id.* at 752 (holding a party was domiciled in California despite party working in Hong Kong because party stayed in California to visit his wife and children and maintained a valid California driver's license).

    *Second*, if the Court finds that Respondent is not domiciled in this District, it should find that Respondent maintains "continuous and systematic" contacts here, satisfying the first statutory requirement.  In the case *In re Wireless Facilities, Inc. Derivatives Litig.*, 562 F. Supp. 2d 1098, 1103 (S.D. Cal. 2008), the court found that a nonresident defendant had "continuous and systematic" contacts with California, even though the nonresident defendant "never intended to return to California once he left" over ten years earlier; the judge cited the non-resident defendant's "property ownership coupled with his other contacts with California, that is, maintaining a driver's license" and frequent visits.  *See also id.* (holding it was irrelevant that "the

nonresident defendants claim the only reason [defendant] did not cut all ties with California was because his [ex-]wife" resided in California).  Respondent undoubtedly "resides or is found" in this District.

Respondent is properly subject to discovery of all responsive documents in his possession, custody, or control, notwithstanding that the evidence may be located abroad.  Under established precedent in this Circuit, 1782 Petitioners are entitled to discover all relevant evidence, even when the documents are in possession of a foreign subsidiary.  *See, e.g.*, *Illumina*, 2020 WL 820327, at *10 (declining to "limit production to documents physically located within the United States" and explaining that "concerns about producing documents located outside the United States is largely anachronistic, as Respondents themselves disclosed that documents and information are often located in electronic storage, which can be accessed with equal effort from any location"); *see also In re del Valle Ruiz*, 939 F.3d 520, 532–33 (2d Cir. 2019) (holding that "§ 1782 can be used to reach documents stored overseas" and "the text of § 1782 authorizes discovery pursuant to the Federal Rules of Civil Procedure" which, in turn, "authorize extraterritorial discovery so long as the documents to be produced are within the subpoenaed party's possession, custody, or control.").[12]

**B.    The Discovery Sought Is "For Use" In a Foreign Proceeding.**

To establish that the information sought is "for use" in a foreign proceeding, Petitioners must merely show that they have "the procedural right to submit the requested documents to" the foreign tribunal.  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).  A Section 1782 petitioner is not required to demonstrate that

---

[12] *See also In re Accent Delight Int'l Ltd.*, No. 16-MC-125 (JMF), 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018), *aff'd,* 791 F. App'x 247 (2d Cir. 2019) ("[T]he plain language of Section 1782 imposes no geographical limit on the production of documents[; t]o the contrary, [it] explicitly empowers courts to allow discovery to be taken and produced in accordance with the Federal Rules of Civil Procedure . . . and discovery under the Federal Rules is indisputably broad and can extend to materials located outside of the [U.S.].").

the information sought would be discoverable or admissible in the foreign proceedings. *In re Request for Judicial Assistance from the Seoul Dist. Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977) ("[F]ederal courts, in responding to [§ 1782] requests, should not feel obliged to involve themselves in technical questions of foreign law relating to . . . the admissibility before [foreign] tribunals of the testimony or material sought."). Instead, the district court considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) (emphasis supplied); *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) ("for use" element satisfied if materials sought can "be employed with some advantage or serve some use in the proceeding"). Here, Cayman Courts will accept and consider any relevant evidence submitted by the parties, so long as it is lawfully obtained within the jurisdiction in which it originates and not otherwise subject to an exclusionary rule of evidence. *See* Mangatal Decl. ¶ 69.

Further, in determining the fair value of the dissenting shareholders' former shareholdings in the Company, Cayman Courts have emphasized the need to consider all facts and matters which may have a bearing on the determination of fair value. *See id.* ¶ 37 (citing *Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information."). The Cayman Court will undoubtedly accept and consider the Requested Discovery here, given its relevance in determining the fair value of the Petitioners' shares. *Id.* ¶ 52. Moreover, there are no restrictions imposed under Cayman Islands law limiting the ability of parties in the Appraisal Proceeding to submit relevant documentary or testimonial evidence obtained pursuant to Section 1782. *Id.* ¶ 63.

Finally, the Requested Discovery is intended for use in the Appraisal Proceeding, which was filed on November 10, 2020. Kish Decl. ¶ 31. The Requested Discovery thus is therefore plainly "for use" in the Appraisal Proceeding under Section

1782, and Petitioners have thus satisfied the second statutory requirement. *See In re Appl. of Temporary Services Ins. Ltd.*, No. 09–MC–48S(Sr), 2009 WL 2843258, at *2 (W.D.N.Y Aug. 28, 2009) (finding discovery sought for use in Cayman proceeding satisfied this prong).

### C.    Petitioners Are "Interested Persons."

"Litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *Pioneer*, 2018 WL 4961911, at *5 ("An 'interested person' includes, but not limited to, parties in a foreign proceeding") (citing *Intel* at 256). Petitioners are claimants in the Appraisal Proceeding, Kish Decl. ¶¶ 2, 6, and thus "interested persons" under Section 1782.

## II.    **The *Intel* Discretionary Factors Weigh in Favor of Granting Discovery.**

Once the statutory threshold requirements of Section 1782 are met, the district court should consider, in its discretion, whether to order the requested discovery. To do this, the district court looks to the four "*Intel* factors." *See Intel*, 542 U.S. at 264. Each of the *Intel* factors weighs in favor of granting the Application.

### A.    Respondent Is Non-Participant in the Appraisal Proceeding.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. The reason for this inquiry is because "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264.

As Judge Mangatal explains, Respondent is not a party in the Appraisal Proceeding, and therefore will not be subject to party discovery there. Mangatal Decl. ¶ 43. Further, because Respondent resides in the United States, the Cayman Court will not have jurisdiction to compel discovery from it. *Id.* Petitioners, therefore, will not be able to take discovery of Respondent through the Appraisal Proceeding, even though evidence from Respondent is crucial to the fair resolution of the dispute. Accordingly, this first *Intel* factor weighs in favor of granting the Application. *Intel*,

542 U.S. at 256 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."); *In re Republic of Ecuador*, No. C-10-80225, 2010 WL 3702427, at *3 (N.D. Cal. Sept. 15, 2010) ("[Discovery target] is not a party in the international arbitration, and therefore this factor weighs in the [petitioner's] favor.").

### B.    The Cayman Court Will Be Receptive to the Evidence Sought.

The second *Intel* factor requires courts to consider whether the "nature, attitude, and procedures" of the foreign tribunal indicate it is receptive to Section 1782 assistance.  This factor "focuses on whether the foreign tribunal is willing to consider the information sought."  *In re Ex Parte Appl. Varian Med. Sys. Int'l AG*, No. 16-mc-80048-MEJ, 2016 WL 1161568, at *4 (N.D. Cal. March 24, 2016).  There is a strong presumption that foreign tribunals will be receptive to evidence obtained in the United States.  "[W]hen evaluating whether foreign tribunals would accept U.S. assistance," courts do not look for proof that the foreign tribunal will accept the evidence; to the contrary, they "'look for 'authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of section 1782.'"  *Siemens AG v. W. Digital Corp.*, No. 8:13–cv–01407–CAS–(AJWx), 2013 WL 5947973, at *3 (C.D. Cal. Nov. 4, 2013) (quoting *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995)) (emphasis in original).  Absent "*authoritative proof* that a foreign tribunal would reject evidence obtained with the aid of section 1782," courts are to "err on the side of permitting discovery."  *Varian Med. Sys.*, 2016 WL 1161568, at *4 (emphasis added).

Cayman Courts will consider any evidence bearing on determining the fair value of dissenting shareholders' former shareholdings in a company.  *See* Mangatal Decl. ¶ 23.  Moreover, Cayman Courts have specifically held it is permissible to use a Section 1782 application to obtain discovery for use in Cayman Islands proceedings.

*See id*. ¶ 54.[13]   Indeed, the Cayman Court of Appeal in *Lyxor Asset Mgmt S.A. v. Phoenix Meridian Equity Ltd.*, 2009 CILR 553, expressly held that the right to obtain full discovery, including pre-trial deposition testimony, "is a right conferred by U.S. law—it is not a right conferred by, or *to be withheld under Cayman law*." *Id.* ¶ 55 & Ex. 8 (upholding trial court determination to allow the use of discovery obtained through 28 U.S.C. § 1782) (emphasis added).

Similarly, discovery gathered pursuant to 1782 in a recent appraisal proceeding captioned, *In the Matter of Nord Anglia Education, Inc.*, FSD 235 OF 2017, was considered by the Cayman Court in its decision that the fair value of the company's shares was above the merger consideration offered to minority shareholders.   The target of Section 1782 discovery in *Nord* was, as in this case, an advisor in relation to a potential merger—the financial advisor to the special committee.  Kish Decl. ¶ 7.  In *Nord*, the Cayman Court expressly referred to the 2,900 documents the target produced in a Section 1782 proceeding, which "evidenc[ed] the work that [target] did," and stated that such documents "were obviously relevant to advancing a reasoned critique of [target's] DCF analysis."  *In the Matter of Nord Anglia Education, Inc.*, FSD 235 OF 2017 ¶ 49; Mangatal Decl. ¶ 58.

Further, multiple United States courts have recognized that Cayman Courts are receptive to evidence obtained through Section 1782, including in cases granting 1782 discovery for use in the same foreign proceeding at issue here.  *See FourWorld Event Opportunities, LP v. Houlihan Lokey, Inc.*, No. 21-mc-01019, ECF Nos. 56 (C.D. Cal. Jan. 6, 2022); *see also In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R.

---

[13] As explained by Judge Mangatal, "Cayman Islands courts have had the opportunity to consider specifically the use of discovery obtained through Section 1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant in a Cayman Islands proceeding to exercise any rights it may have under Section 1782 to obtain relevant evidence, including deposition testimony, for use in those proceedings." *Id.* ¶ 54.

803, 816 (Bankr. S.D.N.Y. 2018) ("In support of this assertion, the Liquidators present unrebutted evidence that, far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law.").[14]

Thus, in the Appraisal Proceeding, Petitioners will have the right to acquire and present the Requested Discovery to the Cayman Court in support of its claims. *Id.* Moreover, the Cayman Court will accept and consider the evidence given its significance in determining the fair value of the Petitioners' shares in 58.com. *See In re Ex Parte Appl. of Ambercroft Trading Ltd.*, No. 18-mc-80074-KAW, 2018 WL 2867744, at *4 (N.D. Cal. June 11, 2018); *see also IPCom GMBH & Co. KG v. Apple Inc.*, 61 F. Supp. 3d 919, 924 (N.D. Cal. 2014) (rejecting the argument that subpoena issued pursuant to Section 1782 should be quashed because there was a "low probability" the information would be relevant to the foreign proceeding); *Varian Med. Sys.*, 2016 WL 1161568, at *4 ("In the absence of authoritative proof that a foreign

---

[14] *See also Gushlak v. Gushlak*, 486 Fed. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 in connection with Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782 discovery for use in Cayman proceedings); *In re Penner*, No. 17-cv-12136-IT, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman Court "is open to receiving § 1782 discovery"). Indeed, two district courts recently granted 1782 petitioners' applications for both document discovery and a deposition for use in an appraisal proceeding in the Cayman Islands. *See In re Application of Athos Asia Event Driver Master Fund*, No. 4:21-MC-00153-AGF, 2021 WL 1611673, at *1 (E.D. Mo. Apr. 26, 2021) ("There is no indication in the record here that a discovery order would be unwelcome by the Cayman Islands court."); *In re Application of Athos Asia Event Driven Master Fund*, No. 1:21-MC-00208-GBF, ECF 8 (S.D.N.Y. Mar. 3, 2021) (granting 1782 discovery for use in Cayman appraisal proceeding); *see also In re Application of Athos Asia Event Driven Master Fund*, No. 4:21-MC-00153-AGF, ECF No. 1-5, at *8 (E.D. Mo. March 1, 2021) (Cayman counsel declaration discussing Cayman Courts' general receptivity to live witness testimony in appraisal proceedings and citing Cayman Islands law).

tribunal would reject evidence obtained with the aid of Section 1782," courts tend to "err on the side of permitting discovery."). Accordingly, this factor also weighs in favor of granting the Application.

### C. Petitioners Are Not Circumventing Foreign Proof-Gathering Restrictions.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Importantly, the third *Intel* factor is satisfied unless the foreign court actively prohibits the petitioner from gathering the information sought. *In re Koninklijke Philips N.V.*, No.: 17-MC-1681-WVG, 2018 WL 620414, at *2 (S.D. Cal. Jan. 30, 2018); *Ambercroft Trading*, 2018 WL 2867744, at *5; *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons [that] do not necessarily signal objection to aid from United States federal courts."); *Siemens AG*, 2013 WL 5947973, at *3. In addition, there is not "a 'quasi-exhaustion requirement,'" *i.e.*, a requirement that Petitioners first seek the discovery in the foreign court. *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997); *see also de Leon v. Clorox Company*, No. 19-mc-80296-DMR, 2020 WL 4584204, at *8 (N.D. Cal. Aug. 10, 2010) (no requirement to first seek discovery in foreign tribunal); *Illumina*, 2020 WL 820327, at *6 (no exhaustion requirement).

Here, the discovery sought does not attempt to circumvent any proof-gathering restrictions in the Cayman Islands. To the contrary, as Judge Mangatal explains, "Cayman courts expect the parties to obtain the evidence they believe is necessary to prosecute their case" and "[t]hus there is no requirement to obtain permission from a Cayman court before seeking relevant evidence abroad." Mangatal Decl. ¶ 66. Further, the Cayman Islands Court of Appeal has expressly held that "*prima facie* a

party who can invoke the jurisdiction of the US District Court under § 1782 may choose to do so." *See Phoenix Meridian Equity Limited v. Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* [2009 CILR 553]; Mangatal Decl. ¶ 57. This factor, therefore, weighs in favor of granting the Application.

### D.    The Subpoena Is Not Unduly Burdensome.

The final *Intel* factor looks to whether the discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. *See In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998); *Varian*, 2016 WL 1161568, at *5.

Here, the Subpoena is narrowly tailored with respect to the time period and subject matter of the requests. *First*, the Subpoena is limited to documents and information directly relevant to two issues in the Appraisal Proceeding—(i) the process undertaken by the 58.com Special Committee that culminated in the 58.com's board's approval and recommendation of the Merger to 58.com stockholders and (ii) Respondent's role and responsibilities as a strategic consultant to the Company and its board, including the advice and analysis Respondent was tasked with providing Concerning the Merger. These issues will be central in the Appraisal Proceeding. *See* Mangatal Decl. ¶ 23.

*Second*, the discovery requests are temporally limited to the period during which the 58.com board reported in public filings that it was negotiating the transaction with the Buyer Group. *See In re Gushlak*, No. 11–MC–218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) (a Section 1782 request, like any discovery request, is "reasonably calculated to lead to relevant matter if there is any possibility that the information sought may be relevant to the subject matter of the action").[15]

---

[15] *See also First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding subpoena reasonable that only sought documents concerning "precise subject

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

*Third*, Petitioners are willing to meet and confer with Respondent to address any scope or burden concerns. If the Court has remaining concerns about undue burden, granting the Application will not preclude Respondent "from bringing a motion to quash or modify" the discovery sought. *In re Appl. of Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203-MEJ, 2016 WL 6474224, at \*7 (N.D. Cal. Nov. 2, 2016).[16]

## E.    Expedited Compliance with the Subpoenas Is Warranted.

In the event the Court grants Petitioners' Application, Petitioners request the Court direct Respondent to produce responsive documents within 30 days of service and submit to a deposition on a mutually agreeable date within a reasonable time after Respondent's confirmation of final production of documents. Expedition of this Application and Respondent's time to comply with the Subpoena will permit sufficient time for (a) this Court's resolution of Petitioners' Application and any objections to the Subpoena; (b) Respondent's collection, review, and production of responsive documents; (c) Petitioners' counsel's review of documents produced by Respondent; and (d) Petitioners' timely submission of relevant documents to the court. Expedition is key, given relevant evidence has already been made available to experts retained by Dissenting Shareholders in the Appraisal Proceeding, who are actively working to render their expert opinion.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant their petition for an order pursuant to 28 U.S.C. § 1782.

---

matter of the underlying [proceedings]"); *Minatec Finance S.A.R.L. v. SI Grp. Inc.*, Civ. No. 1:08–CV–269 (LEK/RFT), 2008 WL 3884374, at \*8 (N.D.N.Y. Aug. 18, 2008); *Local Court of Wetzlar, Germany*, 2018 WL 2183966, at \*4.

[16] *See also In re Republic of Ecuador*, 2010 WL 3702427, at \*5; *Ambercroft Trading*, 2018 WL 2867744, at \*5. If the Court finds any merit to such objections, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Europmea, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 (2d Cir. 1995).

1  Dated: February 2, 2022

2

3                                      By:   */s/ John J. Kucera*
                                            _____
4                                           John J. Kucera

5                                           **BOIES SCHILLER FLEXNER LLP**
                                            John J. Kucera (SBN 274184)
6                                           *jkucera@bsfllp.com*
                                            725 S Figueroa Street, 31st Floor
7                                           Los Angeles, CA 90017
                                            Telephone: (213) 995-5758
8                                           Facsimile: (213) 629-9022

9                                           Duane L. Loft (*pro hac vice* application
                                            forthcoming)
10                                          *dloft@bsfllp.com*
                                            Brianna S. Hills (*pro hac vice*
11                                          application forthcoming)
                                            *bhills@bsfllp.com*
12                                          55 Hudson Yards
                                            New York, NY 10001
13                                          Telephone: (212) 446-2300
                                            Facsimile: (212) 446-2380
14
                                            **GRANT & EISENHOFER P.A.**
15                                          Christine Mackintosh (*pro hac vice*
                                            application forthcoming)
16                                          *cmackintosh@gelaw.com*
                                            123 S. Justison Street
17                                          Wilmington, DE 19801
                                            Telephone: (302) 622-7081
18                                          Facsimile: (302) 622-7100

19                                          **LABATON SUCHAROW LLP**
                                            Ira A. Schochet (*pro hac vice*
20                                          application forthcoming)
                                            *ischochet@labaton.com*
21                                          140 Broadway
                                            New York, NY 10005
22                                          Telephone: (212) 907-0864
                                            Facsimile: (212) 818-0477
23
                                            *Attorneys for Petitioners*
24

25

26

27

28

APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782